# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

**FILED**

Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By Carrie Ramirez at 2:49 pm, May 02, 2008

In the matter of: )
)                           Chapter 7 Case
SIDNEY WAYNE CRIBBS )
YULONNIE E. CRIBBS )                    Number <u>07-41342</u>
)
*Debtors* )

## ORDER ON MOTION OF THE UNITED STATES TRUSTEE
## TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)(1)

The United States Trustee filed a Motion to Dismiss this Chapter 7 case

under the provisions of 11 U.S.C. § 707(b) which provides in relevant part that a case may

be dismissed if a court finds that the granting of Chapter 7 relief "would be an abuse of the

provisions of this chapter." Debtors' counsel and counsel for the United States Trustee

entered a stipulation of facts which provides that "the presumption of abuse arises in this

case." Exhibit UST-1. Under § 707(b)(2)(B), a presumption of abuse "may only be rebutted

by demonstrating special circumstances, such as a serious medical condition or a call or order

to active duty in the Armed Forces, to the extent such special circumstances that [sic] justify

additional expenses or adjustments of current monthly income for which there is no

reasonable alternative." Section (2)(A)(ii)(I) provides "[n]otwithstanding any other provision

of this clause, the monthly expenses of the debtor shall not include any payments for debts."

11 U.S.C. § 707(b)(2)(A)(ii)(I) (emphasis added). Debtors argue that the circumstances

leading to their borrowing funds from Mr. Cribbs' 401(k) were "special" and thus rebut the

presumption of abuse.

Alternatively, if this Court finds that the presumption is rebutted, the United States Trustee asks this case be dismissed under §707(b)(3) because the totality of the circumstances of the debtor's financial situation demonstrates "abuse." The Trustee argues that Debtors have the ability to repay 34.14% of their unsecured debts through a hypothetical Chapter 13 plan without forfeiting their voluntary 401(k) contributions and loan payments. Brief of U. S. Trustee, Dckt. No. 44, p.6-7 (February 29, 2008).

FINDINGS OF FACT

Mr. and Mrs. Cribbs have been married approximately fifteen years and have two children. Mr. Cribbs works at Georgia Pacific Corporation, and in April 2002, they purchased a home for approximately $110,000.00. It was refinanced in 2004, and in 2005, they took out a second mortgage on the home. In 2007, they sold the home for $174,000.00, receiving approximately $12,800.00 in equity which they used to pay off a loan against Mr. Cribbs' 401(k) retirement plan. *See* Exhibit D-1. That loan had been made during a previous effort on their part to consolidate some of their ongoing debts. Notwithstanding giving up their family home, they still had a heavier debt load than they could manage in the regular course of employment and payment of day-to-day living expenses.

Mrs. Cribbs began to research solutions for their dilemma and found an on-line website for a company known as Debt Options which offered a non-bankruptcy way to

repay their debt. After discussing the program over the telephone with a representative and discussing it with her husband, Mrs. Cribbs gave the Debt Options representative a complete list of the creditors to whom they owed money and the amount of that debt. The representative informed her that if Debtors would make a commitment to pay $540.00 per month for sixty months, Debt Options could negotiate their obligations sufficiently to render them debt free.

Debtors executed a power of attorney to permit Debt Options to undertake this restructuring on their behalf. Exhibit D-3. Debtors were to deposit $540.00 per month in a special account and did, in fact, make the first month's deposit on April 23, 2007. Exhibit D-6. After realizing that Debt Options would not consummate debt settlements until there were sufficient funds on hand to pay a creditor in cash, Mr. and Mrs. Cribbs reasoned that they might pay the program out quicker with a lump-sum deposit for Debt Options to manage. After further consultation they understood that if Debt Options received a lump-sum deposit of $30,000.00, it would negotiate a complete settlement of all their outstanding bills. As a result, Mr. Cribbs approached his employer and borrowed net proceeds of approximately $29,535.00 from his company-sponsored 401(k) retirement program. *See* Exhibit D-5. Debtor granted a security interest in his retirement fund balance to secure the advance that he received. Exhibit UST-9. His loan balance is currently $26,402.00. Exhibit UST-10. His retirement account balance, if it were set off, would be approximately $60,000.00. The repayment terms require bi-weekly payments of $284.17 for 60 months. If these payments are not made, the retirement account will be set off, Debtors will be taxed

on $26,000.00 of income, and Debtors will have to pay an additional ten percent penalty.

Debtors were consulted each time Debt Options negotiated a compromise settlement with creditors.  In fact, Debt Options paid off a substantial amount of the debt.  However, in July 2007, Debt Options informed Debtors that there was not enough money in the account to settle their remaining debts.  Since Debtors did not understand why there was a shortfall in light of their previous understanding, Mr. Cribbs carried on a more detailed conversation with a Debt Options counselor and was informed that $30,000.00 had simply been an estimate, subject to later negotiations, and that Debtors had signed a contract to that effect.  When Debtors informed Debt Options that they had never signed such a contract, they were provided with a copy of one which bears an _electronic_ signature that apparently was affixed by Debt Options utilizing the power of attorney.  Exhibit UST-5.  Indeed, the contract contains predictable caveats absolving Debt Options from any liability if the monies on deposit are insufficient to pay off the debts, if circumstances beyond Debt Options' control prevent completion of any transaction, if any special, incidental, consequential, exemplary or punitive damages arise, or if Debtors rely to their detriment on any information provided by third parties.  Debtors never saw that contract until August 2007.  At that point, the balance in the Debt Options' account of $1,596.85 was returned to them.  *See* Exhibit UST-6.

During the mid to late summer, Debtors were sued in Superior Court by one of their remaining creditors, an event which led to their filing this Chapter 7.  They listed on

Schedule "F" approximately $19,977.56 in unsecured claims remaining, which is the total of the three accounts that were not settled by Debt Options.[1]  Exhibit UST-3; Petition, Dckt. No. 1, Sch. F (August 29, 2007).

Based on the above facts, Debtors contend that "special circumstances" exist and that this Court should reduce their current monthly income ("CMI") which was stipulated to be $582.58, to a negative number, after subtracting the monthly 401(k) loan repayment amount of approximately $615.00.  They argue, despite my narrow reading of "special circumstances" in In re Lightsey, 374 B.R. 377 (Bankr. S.D.Ga. 2007), that (1) this is a unique situation not of the Debtors' making; (2) that they acted at all times in good faith in an effort to find a non-bankruptcy solution to their debt problems; (3) it was unforeseen at the time they withdrew the 401(k) funds that they would fall short in repaying all their debts and that they would incur additional tax liability; (4) that their repayment obligation to the 401(k) plan is not a "debt" and thus not prohibited from consideration as a reduction in CMI; and (5) there is no reasonable alternative to repay that advance according to the payment terms because failure to do so would result in additional tax and penalties.

The United States Trustee contends that no reduction in CMI is permissible in the "special circumstances" analysis under my narrow interpretation in Lightsey and that repayment obligations cannot be permitted as a reduction in CMI since it is repayment of a

---

[1]  The three accounts are as follows: Chase Bank for $7,562.18; Discover for $11,004.38; and Lowes for $1,411.00.

debt. In the alternative, the United States Trustee argues that Debtors have a reasonable alternative to a reduction of their CMI by simply permitting the loan to be offset against the Debtor/Husband's retirement fund balance. The Trustee also argues that converting to Chapter 13 is a reasonable alternative for Debtors.

## CONCLUSIONS OF LAW

### 1. "Special Circumstances" under §707(b)(2) exist in this case

The parties stipulated that "the presumption of abuse arises in this case." Exhibit UST-1. Debtors may rebut the presumption of abuse, but only "by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that [sic] justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. §707(b)(2)(B)(i). To establish "special circumstances," a debtor must provide an itemization of each additional expense or adjustment of income and provide "(I) documentation for such expense or adjustment to income; and (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable." Id. § 707(b)(2)(B)(ii). The analysis of whether Debtor has shown "special circumstances" is a fact-specific inquiry. In re Lenton, 358 B.R. 651, 661 (Bankr.E.D. Pa. 2006). Debtors' explanation centers on the factual circumstances that led to Debtors' borrowing from Mr. Cribbs' 401(k) plan.

The mere fact that Debtors have an obligation to reimburse their 401(k) plan

is not enough to constitute "special circumstances." However, the circumstances that led them to taking the advance withdrawal from the 401(k) plan may be "special" under §707(b)(2)(B)(I). *See* Eisen v. Thompson, 370 B.R. 762, 773 (N.D.Ohio 2007)("[A]n obligation to repay a loan is not a 'special circumstance,' but the circumstances that led to taking that loan may be 'special' under §707(b)(2)(B)(I)."); *see also* In re Haman, 366 B.R. 307, 313 (Bankr.D.Del. 2007); In re Turner, 376 B.R. 370,  378 (Bankr.D.N.H. 2007). Furthermore, "[t]he exception does not permit every conceivable unfortunate or 'unfair' circumstance to rebut the presumption of abuse, but includes only those circumstances that cause higher household expenses or adjustments of income 'for which there is no reasonable alternative,' i.e., they are unforeseeable or beyond the control of the debtor." In re Lightsey, 374 B.R. at 381-82.

Courts have struggled to define the scope of what constitutes a "special circumstance." Generally speaking, one line of cases takes a narrow view of the exceptions and limits them to circumstances similar to the examples in the statute. *See e.g.,* In re Naut, slip op., 2008 WL 191297, at *10 (Bankr. E.D.Pa., January 22, 2008); *see* In re Hanks, 362 B.R. 494, 502 (Bankr. D. Utah 2007)("The statutory examples of serious medical condition and active military service, although not exhaustive, are instructive of the kinds of 'special circumstances' that would justify deviations from Form B22C under the principal of *ejusdem generis*."). At the other end of the spectrum, some courts take an expansive view. For example, some courts find "special circumstances" if debtors lack a "meaningful ability to repay" in light of income or expense adjustments not reflected in the means test formula or

which, if not adjusted, will result in economic unfairness to debtor. *See e.g.,* In re Delbecq, 368 B.R. 754, 758 (Bankr. S.D. Ind. 2007); In re Knight, 370 B.R. 429, 437-38 (Bankr. N.D.Ga. 2007); In re Martin, 371 B.R. 347, 352-56 (Bankr. C.D. Ill. 2007).

In Lightsey, I adopted a narrower view because I regard the broader interpretation to be so expansive and unfettered that it swallows the rule. In other words, the "meaningful ability to repay" standard for finding that there are "special circumstances" eviscerates the means test calculation by reintroducing, in every case, a more subjective judge-driven "smell test" to decide whether debtors can afford to repay. Under this approach, inability to repay standing alone makes the circumstance "special." If the court believes that debtor cannot repay, its conclusion trumps the means test which Congress established to measure ability to pay and returns § 707 to the pre-BAPCPA world that Congress rejected.

While the adjectives used in cases adopting a narrower view of special circumstances varies, their goal has been to describe that limited group of special circumstances that qualify under a fair reading of what Congress intended. Perhaps the best description of the scope of the exception is found in In re Castle, 362 B.R. 846, 851 (Bankr. N.D. Ohio 2006):

> To be sure, the two examples of "special circumstances"
> in § 707(b)(2)(B)(I) are just that: examples, and thus do
> not constitute the only types of circumstances which may

be used to rebut a presumption of abuse. But they do show a commonality; they both constitute situations which not only put a strain on the debtor's household budget, but they arise from circumstances normally beyond the debtor's control. Under the statutory interpretation canon of *ejusdem generis*, a court is to limit the sphere of permissible "special circumstance" to ones having such similar traits and characteristics. This interpretive doctrine, meaning literally "of the same kind," holds that a court is to interpret legislatively provided examples of a specific nature as typical of the general category covered. [internal citations omitted].

In trying to encapsulate the rule in a shorthand word or phrase, courts have utilized various concepts:

1)      Unanticipated.  In re Sparks, 360 B.R. 224, 230 (Bankr. E.D. Tex. 2006).

2)      Truly unavoidable. Id.

3)      Beyond the reasonable control of the debtor.  In re Tuss, 360 B.R. 684, 701 (Bankr. D. Mont. 2007).

4)      Out of the ordinary. In re Armstrong, slip op. 2007 WL 1544591, at *2 (Bankr. N.D. Ohio, May 24, 2007).

5)      Unforeseeable. In re Lightsey, 374 B.R. at 381-82.

"Special Circumstances" have also been found where debtors paid voluntary, but non-manipulative expenses, incurred for reasons consistent with prevailing and clear public policy. For example, higher than normal living expenses or reduced income

caused by the desire to preserve family cohesion or stability in the face of events not entirely controllable by debtor have been approved as within the exception. *See e.g.,* In re Graham, 363 B.R. 844, 849-50 (Bankr. S.D. Ohio 2007);   In re Armstrong, slip op., 2007 WL 1544591, at *3.

Undoubtedly, the examples of circumstances which share common traits and attributes to those named in the statute may expand.  But whatever the specific verbiage, all these cases resist the temptation to retreat to the familiar pre-BAPCPA world where judges' broad discretion was the definitive test.  Courts which make subjective findings of lack of "ability to pay" or accept the mere lack of a "reasonable alternative" to paying an expense as establishing a special circumstance, even when the circumstance that led to incurring the expense was not "special," in my view, ignore the proper role of Congress.  However much one might disagree with the means test, Congress made the clear decision to move "ability to pay" from a largely subjective analysis to an objective, formulaic, and, yes, rigid analysis. While Congress adopted a "special circumstance" safety valve to that means test formula, judges should be mindful to honor the fundamental intent of the new statute.  I therefore reaffirm the essence of my Lightsey ruling while at the same time conclude that Debtors here have demonstrated "special circumstances."

I find that Debtors have established the requisite "special circumstances" to justify a reduction in their CMI.  They are committed to repayment of a 401(k) loan which I find to be voluntary, but non-manipulative.  It is a payment that arose under circumstances

affirmed by clear public policy.  It is consistent with bankruptcy policy because the expense

exists precisely because Debtors attempted to find a non-bankruptcy solution to their problem

first.  It is also consistent with public policy because it is a payment made in order to preserve

the family's long-term financial health during retirement, consistent with provisions of law

which place contributions to, and the corpus of these retirement funds, beyond the reach of

creditors.  *See* 11 U.S.C. § 522(b)(3)(C); 11 U.S.C. § 541(b)(7); 26 U.S.C. § 401(k); 29

U.S.C. §§ 1002(3)(defining "employee benefit plan"), 1003(a)(defining ERISA's coverage);

In re Johnson, 346 B.R. 256, 263 (Bankr. S.D. Ga. 2006)(Dalis, J.).


The bottom line is that they did everything possible to repay their debts

without resorting to filing bankruptcy.  This is precisely what Congress had in mind when

it adopted BAPCPA - to raise the bar for potential debtors in discharging their debts and

encourage debtors to pay their unsecured creditors.  *See* Warren v. Wirrum, 378 B.R. 640,

644 (N.D.Cal. 2007)("The avowed purpose of BAPCPA was to reduce the number of

bankruptcy filings, which Congress viewed as excessive and used too often 'as a first resort,

rather than a last resort.'" *quoting* H.R.Rep. 109-31 at 4, reprinted in 2005 U.S.C.C.A.N. 88,

90 (2005)).


This purpose is evident in the requirement for pre-bankruptcy credit

counseling, a worthy if seldom-successful goal intended to steer qualified borrowers into

consensual, non-bankruptcy debt resolution repayment plans.  *See* 11 U.S.C. § 109(h).  That

is what Debtors attempted to do.  They withdrew $29,535.00 from Mr. Cribbs' retirement

fund to settle their debts outside of bankruptcy. These funds are exempt property not subject to creditors' claims. *See* 11 U.S.C. § 522(b)(1) & (b)(3)(c). They delivered this money to a company they thought would retire all their debt for them, and upon elimination of this debt, they planned to repay the 401(k) advance over time. The fact that their effort only partially succeeded does not alter the fact that they acted at all times in perfect good faith. They did repay nearly $20,000.00, obtained debt write-offs of over $17,000.00, paid expenses including a fee to Debt Options (25% of the write-off amount) of approximately $4,300.00, and were left with approximately $19,977.56 in unpaid debt.

I find that these circumstances qualify as "special" not simply because they must repay the advance, but because the circumstances under which they took the advance were extraordinary or special, even though voluntary. They took the advance to repay debts without resorting to bankruptcy, not for unnecessary consumer purchases or other frivolous reasons. The circumstances are also "special" because Debtors encroached on funds that are exempt from creditors claims to pay creditors. When the repayment plan fell short, they had no remaining resources to withstand the subsequent collection efforts of the unpaid creditors. Finally, repayment of the 401(k) advance is unavoidable because if they default in their monthly repayments, additional income of over $26,000.00 plus a ten percent penalty will be assessed against them.

These monthly payments deducted as a "special circumstance" expense reduce their CMI to a negative number. They do not constitute repayment of debt which is

a prohibited category of a "special circumstance" under § 707(b)(2)(A)(ii)(1). <u>Eisen v. Thompson</u>, 370 B.R. at 768-69 & n.10.

The United States Trustee argues that Debtors have two reasonable alternatives to making their 401(k) payments: First, that Debtors simply permit the balance owed to be set off against the retirement fund balance. That is not a reasonable alternative. A set off would reduce their retirement fund by nearly twenty-five percent and cost them countless thousands of dollars in the growth of the retirement fund between now and retirement. This argument is directly contrary to public policy which favors treating retirement assets as exempt property. The math may work, but the logic fails. Set- off of the retirement fund advance as a means of avoiding the reduction in CMI is not a reasonable alternative. Second, the Trustee argues that filing a Chapter 13 case is a reasonable alternative to Debtors' current payment schedule on the 401(k) advance. According to the United States Trustee, Debtors would have disposable income, after paying off the 401(k), of $6,820.00 available over a five year period for unsecured creditors. I hold that the "reasonable alternative" analysis must be limited to examining Debtors' ability either to avoid paying the additional expenses or increasing their income, not examining a hypothetical Chapter 13 repayment plan. "The Court cannot [look at potential Chapter 13 payments in analyzing § 707(b)(2)] . . . as it would violate the Congressional intent behind the means test. Rather, consideration of the potential results under a hypothetical chapter 13 plan belongs more properly under the section 707(b)(3) totality of circumstances test." <u>In re Haman</u>, 366 B.R. at 317; <i>see also</i> <u>In re Johns</u>, 342 B.R. 626, 629 (Bankr. E.D.Okla. 2006).

As the Bankruptcy Court of the District of Delaware explained:

> Because the means test is based upon historical income and expenses, it was "not intended to . . . produce the most accurate prediction of the debtor's actual ability to fund a chapter 13 plan . . . ." [In re Wuller, slip op., 2006 WL 1314125, at *6 (Bankr. N.D. Ga. May 1, 2006)]; *accord* In re Miller, 361 B.R. 224, 234-35 (Bankr. N.D.Ala. 2007). Rather, that forward-looking analysis belongs in section 707(b)(3)'s totality of the circumstances test, where future or foreseeable circumstances may be considered. *See, e.g.,* In re Hartwick, 359 B.R.16, [21-22 (Bankr. D.N.H. 2007)].
>
> The Court in Hartwick has accurately summarized the interplay between sections 707(b)(2) and 707(b)(3): "Congress' intent in adding the Means Test was to create a 'mechanical' formula for presuming abuse of Chapter 7." [In re Randle, 358 B.R. 360, 363-64 (Bankr. N.D. Ill. 2006)]. "Congress' intent to use a standardized or mechanical test and avoid reliance on individualized information as much as possible is demonstrated throughout § 707(b)(2)." Id. The major objective of Congress in adding the means test in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse. In re Hartwick, 352 B.R. 867, 870 (Bankr. D. Minn. 2006). However, Congress did not remove the ability of bankruptcy courts to consider circumstances, including postpetition developments, in determining abuse. On the contrary, Congress expressly incorporated the formerly judicially created totality of the circumstances test which permits consideration of circumstances both preceding and following the filing of the petition.
>
> In re Haman, 366 B.R. at 317.

Pursuant to the foregoing, I find that Debtors have established the requisite

"special circumstances" to justify a reduction in current monthly income for which there is no reasonable alternative, and as a result there is no presumption of abuse in this case.

### 2. This case does not constitute an abuse under the totality of the circumstances test of 11 U.S.C. §707(b)(3)

The United States Trustee alternatively contends that Debtors' case should be dismissed as an abuse under the "totality of the circumstances" test of § 707(b)(3)(B). That section states:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider–
>
> (A)  whether the debtor filed the petition in bad faith; or
>
> (B)  the totality of circumstances . . . of the debtor's financial situation demonstrates abuse.
>
> 11 U.S.C. § 707(b)(3).

Since Debtors have rebutted the presumption of abuse, the United States Trustee bears the burden of proving that a totality of circumstances of the debtor's financial situation demonstrates "abuse." *See* In re Walker, 383 B.R. 830, 836 (Bankr. N.D.Ga. 2008) ("the U. S. Trustee is required to come forth with evidence to persuade the Court that relief would be an abuse.").

The United States Trustee asks this Court to hold that Debtors' financial situation demonstrates "abuse" since Debtors "have the ability to repay 34.14%[2] of their unsecured debts through a Chapter 13 plan without forfeiting their voluntary 401k contributions and loan repayments." The Trustee points out:

> Assuming (1) that the Court enters an order requiring the debtors to convert to chapter 13 on March 1, 2008 and (2) that the debtors convert to chapter 13 and file their plan on March 2, 2008, then the debtors' five-year commitment period in chapter 13 will run from April 1, 2008 through March 31, 2013. *See* 11 U.S.C. §1325 and 1326. The debtors' 401k loan payments are deducted from Mr. Cribbs' wages every two weeks in the amount of $ 284.17. The last payment on the debtor's 401k loan will be made on April 19, 2012. Beginning with Mr. Cribbs' bi-weekly paycheck dated May 3, 2012, the debtors will have $284.17 in income available every two weeks that can be devoted to repayment of their creditors. From May 3, 2012 through the end of the debtors' chapter 13 commitment period, Mr. Cribbs will receive 24 bi-weekly paychecks, resulting in disposable income totaling $6,820.08 (24 x $284.17), an amount equal to 34.14% of the total unsecured debts reported on the debtors' schedule F ($19,977.56). No other debts are disclosed on the debtors' schedules.

> Brief of the U.S. Trustee in Support of Closing Argument, Dckt.No. 44, pgs. 5-7.

---

[2] The United States Trustee's calculation of the possible dividend in a hypothetical Chapter 13 case is premised on the notion that a Chapter 13 case would extend roughly twelve months longer than the 401(k) repayment term. That supposition is based on a theoretical Chapter 13 filing date of March 2008 and a five year plan. However, this Chapter 7 case was filed on August 29, 2007. In analyzing whether this Chapter 7 case is abusive, it may be that the projected payment in Chapter 13 would have to be measured from the Chapter 7 filing date, not the hearing date on the Motion to Dismiss, since the issue is whether as of the filing date, Debtors were abusing Chapter 7. If that date controlled, Debtors' dividend would be only 11% (284.17 X 8 = 2273.36 divided by $19,977.56 in unsecured claims).

Alternatively, since Debtors are young and in good health and since Mr. Cribbs' employment is stable, the Trustee argues that "the debtors would not face any undue hardship from temporarily ceasing their voluntary 401(k) plan contributions." Id., pg. 7.

Section 707(b)(3) incorporates the judicially constructed tests of bad faith and totality of circumstances, concepts which were used pre-BAPCPA for determining whether a debtor's Chapter 7 case should be dismissed for "substantial abuse." Thus, it is appropriate to apply pre-BAPCPA concepts for determining "abuse" under current §707(b)(3); In re Walker, 383 B.R. at 836-37; see also In re Henebury, 361 B.R. 595, 604 (Bankr.S.D.Fla. 2007). "Pre-BAPCPA, there was a split of authority among the circuits regarding what constituted 'substantial abuse.'[3] . . . although the tests used by various courts of appeal did not employ precisely the same language, they shared common elements." In re Henebury, 361 B.R. at 604 (citing First USA v. Lamanna (In re Lumanna), 153 F.3d 1, 4 (1st Cir. 1998)). "While a debtor's ability to pay was always a factor in a court's 'substantial abuse' determination, the extent to which courts relied on the debtor's ability to pay varied." Id.(citing In re DeGross, 272 B.R. 309, 312 (Bankr. M.D.Fla. 2001)).

Three approaches were established by the circuit courts pre-BAPCPA:[4] (1)

---

[3]"BAPCPA removed the presumption in favor of granting the debtor relief and lowered the standard required for dismissal from a showing of a 'substantial abuse' to a showing of an 'abuse,' In re Walker, 383 B.R. at 837.

[4]The Eighth and Ninth Circuit "per se" approach comes from United States Trustee v. Harris, 960 F.2d 74, 76 (8th Cir. 1992) and Zolg v. Kelly (In re Kelly), 841 F.2d 908, 914 (9th Cir. 1988). The Fourth Circuit's "totality of circumstances" approach comes from Green v. Staples (In re Green), 934 F.2d 568, 572 (4th Cir. 1991). The First and Sixth Circuit's "hybrid" approach comes from First USA v. Lamanna (In re Lamanna), 153

the Eighth and Ninth Circuits devised a "*per se*" approach under which the debtor's ability

to pay his debts, standing alone, justified dismissal; (2) the Fourth Circuit devised a "totality

of circumstances" approach which required a showing of more than the ability to pay; and

(3) the First and Sixth Circuits created a "hybrid" approach which permitted the dismissal

based on ability to pay alone, but also allowed the debtor to demonstrate mitigating

circumstances. In re Nockerts, 357 B.R. 497, 505 (Bankr.E.D.Wis. 2006); *see generally* In

re Henebury, 361 B.R. at 604-07.


I reaffirm pre-BAPCPA authority in this District and find that in order for

the United States Trustee to satisfy its burden under the 707(b)(3)(B) "totality of

circumstances" test, the Trustee must show more than just Debtors' ability to pay. *See* In re

Ackerberg, slip op., 1998 WL 34066298, at *2-3 (Bankr. S.D.Ga., January 26, 1998)(Davis,

J.)("it requires more than [disposable income in a hypothetical Chapter 13] to justify

dismissal of a case"); In re Rowell, slip op.,1992 WL 12004006, at *4 (Bankr. S.D. Ga.,

December 16, 1992)(Davis, J.)("disposable income is a primary factor but, standing alone

is insufficient to warrant dismissal for substantial abuse."); slip op., In re Elliston, 1991 WL

11002685, at *4-5 (Bankr. S.D.Ga., July 15, 1991)(Davis, J.).


This view is widely shared among bankruptcy courts in this circuit.  In re

Walker, 383 B.R. at 837-38 (Drake, J.)(finding abuse because debtors had reordered their

---

F.3d 1, 4 (1st Cir. 1998) and In re Krohn, 886 F.2d 123, 126 (6th Cir. 1989).

AO 72A
(Rev. 8/82)

priorities in order to subsidize their adult children's college expenses and living expenses.);

*see*   In re Rollins, slip op., 2007 WL 2106087, at *5 (Bankr.M.D.Ga, July 16,

2007)(Hershner, J.); In re Johnson, 318 B.R. 907, 916-17 (Bankr.N.D.Ga. 2005)(Mullins,

J.)("[T]he Debtor's ability to pay as measured by what could be paid in a hypothetical chapter

13 case is not the conclusive factor."); In re O'Connor, 334 B.R. 462, 466 (Bankr.N.D.Fla.

2005)(Killian, J.); In re Lee, 162 B.R. 31, 37 (Bankr.N.D.Ga. 1993)(Murphy, J.)("Analyzing

the totality of the circumstances to determine whether Debtors' petition represents a

substantial abuse is appropriate."); In re Rogers, 168 B.R. 806, 808 (Bankr.M.D.Ga.

1993)(Laney, J.)("This court will stop short, however, of adopting the position that the ability

to repay debts through a Chapter 13 plan is the only determining factor. Substantial abuse

should be determined on a case-by-case basis after considering the totality of the

circumstances."); In re Tefertiller, 104 B.R. 513, 516-17 (Bankr.N.D.Ga. 1989)(Drake, J.).


Section 707(b)(3) specifically directs the Court to consider whether the

debtor filed the petition in "bad faith" *or* whether "the totality of the circumstances . . . of the

debtor's financial situation" demonstrates abuse. Since the U.S. Trustee did not assert that

Debtors filed their petition in bad faith, I consider the following factors to determine whether

the totality of circumstances of the Debtor's financial situation demonstrates "abuse:"


(1) Whether the bankruptcy filing was precipitated by an
unforeseen calamity, such as a sudden illness or
unemployment; In re Walker, 383 B.R. at 387; In re
Walker, 381 B.R. 620, 625 (Bankr. M.D. Pa. 2008); In re
Nockerts, 357 B.R. at 506; In re Rollins, slip op., 2007

WL 2106087, at *6; In re Ackerberg, slip op., 1998 WL 34066298, at *3 (Davis, J.).

(2) Whether the debtor is eligible for chapter 13 relief; In re Walker, 383 B.R. at 387; In re Walker, 381 B.R. at 625;

(3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations. In re Walker, 383 B.R. at 387; In re Walker, 381 B.R. at 625; In re Rollins, slip op., 2007 WL 2106087, at *7;

(4) whether the debtors could provide a "meaningful" distribution in a chapter 13 case; In re Walker, 383 B.R. at 387; In re Rollins, slip op., 2007 WL 2106087, at *6; In re Elliston, slip op., 1991 WL 11002685, at *4 (Davis, J.); In re Strange, 85 B.R. 662, 664 (Bankr.S.D.Ga. 1988)(Davis, J.).

(5) whether the debtor's expenses could be reduced significantly without depriving them and their dependents of necessities,[5] including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition. In re Walker, 383 B.R. at 387; In re Rollins, slip op., 2007 WL 2106087, at *8; In re Walker, 381 B.R. at 625; In re Nockerts, 357 B.R. at 506; In re Ackerberg, slip op., 1998 WL 34066298, at *3 (Davis, J.); and

(6) the period of time over which the debts were incurred; In re Rollins, slip op., 2007 WL 2106087, at *8.

---

[5] For example, "for purposes of the means test, debt secured even by such items as luxury vehicles, pleasure boats, and vacation homes would be deductible. Moreover, under a plain language analysis, the balance of a balloon mortgage that became contractually due during the five years after the bankruptcy filing - and perhaps even the total balance due on a defaulted mortgage that had been contractually accelerated - would be entirely deductible. However, if deductions of this sort allowed a wealthy debtor to avoid the presumption of abuse under the means test, an abuse might still be found in consideration of the 'totality of the circumstances . . . of the debtor's financial situation' pursuant to 707(b)(3)." In re Nockerts, 357 B.R. at 507 (quoting Eugene R. Wedoff, Means Testing in the New § 707(B), 79 Am. Bankr L.J. 231, 273 (Spring 2005)).

The United States Trustee established only that Debtors could pursue a Chapter 13 repayment plan. Without deciding on these facts whether their projected Chapter 13 payment would be "meaningful," I reaffirm that "while the ability to [fund a Chapter 13 plan] is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test." In re Nockerts, 357 B.R. at 507. Therefore, I deny Trustee's motion to dismiss under §707(b)(3)(B). I also am compelled to observe that even if the projected dividend meets the "meaningful" standard, the bulk of the remaining "totality of circumstances" factors lead to the conclusion that these Debtors are in no way abusing the bankruptcy process.

### O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the United States Trustee's Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)(1) is DENIED.

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This ___ day of May, 2008.